Gants, J.
On or about September 13, 1996, the plaintiffs, Randolph and Joanna George, closed on the purchase of the single family residence of the defendant, Suzanne Teare, at 59 Forest Street in Manchester-by-the-Sea. The defendants Jeanne Carpenter and Linda Miller, both of whom were employed by the defendant Eastern Massachusetts Real Estate, Inc. d/b/a Carlson Real Estate Better Homes & Gardens (“Carlson”) (collectively “the brokers”), were Ms. Teare’s real estate brokers with respect to the transaction. In the plaintiffs’ Second Amended Complaint, they allege that Teare and the brokers misrepresented to them that there were no wetlands on the 1.75 acre property, when in fact wetlands occupied roughly one-quarter of this property. The plaintiffs further *275 allege that Teare misrepresented to them that very few golf balls came on the property from the fourteenth hole of the adjoining golf course, when in fact many hundreds of golf balls landed on the property. The Second Amended Complaint includes counts alleging fraudulent misrepresentation, negligent misrepresentation, and Chapter 93A violations against Teare and the brokers, as well as a claim for recission.
The Second Amended Complaint also includes a claim against Teare for slander of title. The background behind this unusual claim is that, four days prior to the closing, the registered land surveyor prepared a plot plan revealing that the driveway of Teare’s neighbors, Stanley and Eileen Rusnak, sat on property owned by Teare. To resolve the concerns raised by this discovery, Teare’s attorney prepared an agreement for the Rusnaks’ signature declaring that the property had been encroached upon by the Rusnaks with the permission of Teare and had not been possessed adversely. The Rusnaks never signed this document and the Georges agreed to proceed to closing without it, albeit at a $5,000 reduction in the sales price. However, five days after the closing on the property, the Rusnaks approached Teare and asked her to sign a quite different affidavit, attesting that “these encroachments by Rusnak and their predecessors in title have at all times since the date of my ownership been open, notorious, and adverse to my ownership.” Teare signed this affidavit. Two years later, in the midst of a dispute between the Georges and the Rusnaks over a water easement, the Rusnaks brought suit against the Georges seeking injunctive relief and added a claim for adverse possession of the property encroachment. The Rusnaks ultimately withdrew this claim of adverse possession, but not until the Georges had expended monies to defend against this claim. They now seek reimbursement for the attorneys fees and litigation expenses incurred in defending this claim.
The defendants Teare and the brokers now move for summary judgment as to all claims against them. For the reasons stated below, these motions are DENIED IN PART AND ALLOWED IN PART.
Claims of Misrepresentation as to the Existence of Wetlands
Viewing the evidence in the light most favorable to the Georges, as I must in a motion for summary judgment, the Georges offered on June 3, 1996 to purchase this property for $550,000, subject to a satisfactory appraisal, an acceptable Title V septic certification, and their review of a Seller’s Statement prepared by Teare. Teare filled out a Seller’s Statement later that same day. She wrote “unknown” in response to the question asking whether there were wetlands on the property. Mr. George asked Ms. Carpenter about this answer and was told that the Town determined whether land constituted a “wetland” and that there were local horror stories about people who learned that property which did not seem a wetland was indeed a “wetland.” Carpenter told George that Teare was afraid and unwilling to state that there were no wetlands and was “taking the safe way out.”
After Teare’s septic system failed a Title V inspection, an engineer retained by Teare brought in an environmental scientist who visited the property on June 25, 1996. The environmental scientist confirmed that wetlands existed on the property and delineated the boundary of the wetlands area with flags. Teare’s engineer, accompanied by Teare, soon went before the Town’s Board of Health and asked the Board to waive the moratorium on sewer hook-ups for the property based in part on the presence of wetlands on the property. On June 26, Teare’s engineer sent the Town a written report asserting that there were wetlands on this property. Teare received a copy of this report.
On June 30, the Georges traveled from San Francisco to visit the property. Mr. George for the third time and Ms. George for the first. The Georges met with Teare, in the presence of Miller and Carpenter, and asked Teare whether there were wetlands present on the property and why an area of the yard was marked with flagged stakes. Teare told the Georges there were no wetlands on the property, and that the flags were placed there as part of the Title V test to delineate the boundaries of the leaching field. According to Mr. George, the brokers did not contradict these false assertions but provided a kind of warning, which in substance declared, “Who knew what wetlands were, it could be so terribly capricious ...”
Before the closing, Teare told both Miller and Carpenter that she had been informed both by her engineer and by the Town’s Conservation Administrator that wetlands were present on the property, and that the Georges should be advised of their existence. Neither passed on this information. Teare also provided her attorney with the engineer’s report declaring the existence of wetlands but did not instruct him to provide a copy to the Georges or their attorney, and he did not.
Teare and the brokers concede that Teare misrepresented the absence of wetlands, but contends that the Georges cannot demonstrate reasonable reliance on this representation because the Georges were plainly told that it was difficult to ascertain whether any area would be deemed wetlands by the Town and that independent inquiry was needed. This Court, for at least three reasons, finds that there is a genuine issue of material fact as to whether the Georges’ reliance was reasonable. First, when Teare made the statement that there were no wetlands on her property (or soon thereafter), she knew that the Town’s Conservation Administrator had concluded that there were wetlands on her property, yet she failed to ensure that this information was provided to the Georges. The brokers learned after this conversation about this determination by the Conservation Administrator, yet they, too, failed to provide this information to correct *276 the misrepresentation they had witnessed. Second, since Teare had resided on the property for 30 years and had been a Manchester -by-the-Sea Selectman, a factfinder could find it reasonable to believe that she knew what she was talking about when she declared that there were no wetlands on her property. Third, it has long been established under Massachusetts law that the recipient of a misrepresentation is justified in relying on its truth even when he may have ascertained the falsity of the representation had he made appropriate inquiry. Yorke v. Taylor, 332 Mass. 368, 374 (1955). This is especially appropriate here where, if Teare had made no representation, the Georges may have made further inquiry on their own.
The defendants also maintain that, if there were any false representations, they are of no consequence since the Georges acknowledged in the Purchase and Sale Agreement that they did not rely on any representations not set forth in that Agreement or previous^ made in writing. This argument fails on two grounds. First, under Massachusetts law, this clause is not an automatic defense to an allegation of misrepresentation. Sheehy v. Lipton Industries Inc. 24 Mass.App.Ct. 188, 193 (1987). “In the realm of fact it is entirely possible for a party knowingly to agree that no representations have been made to him, while at the same time believing and relying upon representations which in fact have been made and in fact are false but for which he would not have made the agreement.” Id. quoting Bates v. Southgate, 308 Mass. 170, 182 (1941). Nor does this clause demonstrate that the representations regarding the absence of wetlands were not relied upon. Sheehy at 194. There is evidence that the Georges did rely upon these representations and did not intend, by executing the Purchase and Sale Agreement, to indicate otherwise. Second, this clause cannot foreclose liability because there indeed was a written representation in the Seller’s Statement — that it was “unknown” whether there were wetlands on the property — that Teare and the brokers later learned was false and misleading but still failed to correct.
For all these reasons, summary judgment is denied regarding the common law claims and the related Chapter 93A claim concerning the alleged misrepresentations regarding the existence of wetlands on the property.
Claims of Misrepresentation as to the Prevalence of Golf Balls
Summary judgment must also be denied with respect to the claims of misrepresentation regarding the prevalence of golf balls landing on the property. There is evidence that Teare told the Georges that in thirty years few golf balls landed on the property, no balls ever landed in the swimming pool, only one window was broken by a golf ball, and that errant golf shots landing on the property were not “enough to be worrisome.” There is also evidence that, in the Georges’ first summer living on the property, roughly 300 golf balls landed on the property, one striking Ms. George and another narrowly missing one of their children. A factfinder permissibly may infer that the accuracy of golfers at the adjoining country club has not markedly diminished in recent years, and that Teare’s representations materially understated the magnitude of the problem faced by slices and hooks.
The Slander of Title Claim
A slander of title claim is essentially a claim of defamation where the false statement focuses on the plaintiffs’ rights in property. As with any defamation claim, it requires a showing by the plaintiffs that (1) the defendant made a false statement, (2) which was published with malice, and (3) caused injury to the plaintiff. See Gott v. Pulsifer, 122 Mass. 235 (1977). In this case, there is evidence sufficient to defeat summary judgment as to each of these elements. Since Teare permitted her attorney to prepare an agreement for the Rusnaks’ signature declaring that the property had been encroached upon by the Rusnaks with the permission of Teare and had not been possessed adversely only a few days before Teare executed an affidavit declaring that “these encroachments by Rusnak and their predecessors in title have at all times since the date of my ownership been open, notorious, and adverse to my ownership,” a factfinder could infer that the first statement, and not the second, was indeed the truth. There is also evidence in the record sufficient to establish malice, regardless of whether that element of malice is satisfied by a finding of negligence or ill will. A factfinder may infer from the evidence that Teare was displeased with the Georges after the closing as a result of their aggressive negotiations and successful demand for additional price concessions. Finally, there is evidence of injury resulting from the attorneys fees incurred to defeat the subsequent claim of adverse possession brought by the Rusnaks.
However, although Teare’s statement may otherwise permit a claim of slander of title, it cannot here because her affidavit falls within the absolute privilege granted to statements made “in the institution or conduct of litigation or in conferences and other communications preliminary to litigation.” Dolan v. Von Zweck 19 Mass.App.Ct. 1032, 1033 (1985) (rescript) quoting Sullivan v. Birmingham, 11 MassApp.Ct. 359, 361 (1981). See also Correllas v. Viveiros, 410 Mass. 314, 320-21 (1991) (statements made “prior to trial are absolutely privileged if they are made in the context of a proposed judicial proceeding”). The purpose behind this absolute privilege is manifest: the law does not want a witness to be affected by the threat of a civil defamation claim in providing full and accurate testimony or pre-trial disclosure. See Correllas v. Viveiros, 410 Mass. at 320; Aborn v. Lipson, 357 Mass. 71, 72 (1970) (“The reason for the privilege is that it is more important that witnesses be free from the fear of civil *277 liability for what they say than that a person who has been defamed by their testimony have a remedy”).
There can be no dispute here that the only reason for the Rusnaks’ attorney to procure this affidavit from Teare was to use it in the event of actual or threatened litigation between the Rusnaks and the new owners— the Georges — over the ownership of the land beneath the Rusnaks’ driveway. While no litigation was specifically planned at the time the affidavit was obtained, the possibility of litigation was contemplated and it was that possibility which caused the Rusnaks to obtain the affidavit in the event that possibility ripened into reality, which it did two years later.
The Georges rely on Section 598, Comment e to the Restatement (Second) of Torts to support their contention that the affidavit was not executed preliminary to litigation. That Comment declares that the absolute privilege ‘'applies only when the communication has some relation to a proceeding that is actually contemplated in good faith and under serious consideration by the witness or a possible party to the proceeding. The bare possibility that the proceeding might be instituted is not to be used as a cloak to provide immunity for defamation when the possibility is not seriously considered.” Restatement (Second) of Torts, §598, Comment e.
Even assuming that this is an accurate description of Massachusetts law, it does not help the Georges. In view of the agreement proposed by Teare prior to the closing asking the Rusnaks to declare that the property had not been possessed adversely, the Rusnaks contemplated in good faith that the Georges, upon taking possession of the property, may attempt through litigation to obtain control over the portion of the land under the Rusnaks’ driveway. The only purpose of such an affidavit was to defend against any such claim or to support a claim of adverse possession through declaratory judgment; it had no purpose apart from litigation and indeed was never made known to the Georges until that litigation actually commenced. Moreover, the Georges’ claim for slander of title did not and could not ripen until that litigation commenced, because the element of injury could not be satisfied in the absence of litigation (or the threat of it). Indeed, the only damages claimed are the attorneys fees and litigation expenses incurred in defending against the Rusnaks’ adverse possession claim brought in reliance on the Teare affidavit.
In short, there is no dispute that, had the Rusnaks’ attorney approached Teare immediately before the adverse possession litigation commenced and obtained the same affidavit, this claim of slander of title would be barred as a result of the absolute privilege. The outcome is not changed simply because the Rusnaks’ attorney had the foresight to obtain this affidavit two years earlier, when the potential for that litigation first emerged and Teare was still available to execute it, especially since the affidavit had no purpose and was never to see the light of day except in the event of the contemplated litigation.
For these reasons, the motion for summary judgment is ALLOWED as to the claim of slander of title (Count 4 of the Second Amended Complaint).
ORDER
For the reasons stated above, the brokers’ motion for summary judgment is DENIED in its entirety. Teare’s motion for summary judgment is DENIED except as to the claim of slander of title (Count 4 of the Second Amended Complaint), as to which summary judgment is ALLOWED.